FILED
2017 Nov-03  PM 04:24
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHWESTERN DIVISION**

| | | |
|---|---|---|
| **STACY DAVIS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **CIVIL ACTION NO:** |
| | ) | |
| **GENESIS HEALTHCARE,** | ) | **JURY DEMAND** |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**COMPLAINT**

**I.     JURISDICTION**

1.      The jurisdiction of this Court is invoked pursuant to the Act of Congress known as 28 U.S.C. §§1331, 1334(4), 2201 and 2202, 42 U.S.C. §2000e *et seq*. This suit is authorized and instituted pursuant to Title VII of the Act of Congress known as the "Civil Rights Act of 1964," as amended, 42 U.S.C. §2000e *et seq*., the "Civil Rights Act of 1991" and 42 U.S.C. §1981. The jurisdiction of this Court is invoked to secure protection of and redress deprivation of rights secured by 42 U.S.C. §2000 *et seq*. providing for injunctive and other relief against race discrimination and retaliation in employment.

2.      The Plaintiff timely filed her charges of race discrimination and

retaliation with the Equal Employment Opportunity Commission (EEOC).  The

Plaintiff further filed her race discrimination and retaliation suit within 90 days after

receipt of her right-to-sue letter issued from the EEOC.

## II.   PARTIES

3.      Plaintiff, Stacy Davis, is an African-American citizen of the United

States and a resident of the State of Alabama.  At all times relevant to this lawsuit, the

Plaintiff was employed by the Defendant at its Cottage of the Shoals Center in

Tuscumbia, Alabama.

4.      Defendant, Genesis Healthcare (hereinafter "Genesis" or "Defendant"),

is an entity subject to suit under Title VII of the Act of Congress known as the "Civil

Rights Act of 1964," as amended, by the "Civil Rights Act of 1991," 42 U.S.C.

§2000e *et seq*. and 42 U.S.C. §1981.  Defendant owns and operates Cottage of the

Shoals, a skilled nursing facility in Tuscumbia, Alabama.

## III.   FACTS

5.      The Plaintiff re-alleges and incorporates by reference paragraphs 1-4

with the same force and effect as if fully set out in specific detail hereinbelow.

6.      Davis initially worked at Cottage of the Shoals Center ("CSC") in 2007

as a nursing supervisor over the front east and front west areas.  At that time, the

facility was managed by a company called SunBridge Healthcare.  Davis left CSC to

work as a home health nurse for a short period of time.

7.      In June of 2011, Davis returned to CSC.  The facility was then owned by Defendant Genesis Healthcare.  At that time, Davis was hired as a Nurse Practice Educator.  In that position, Davis coordinated staff development at CSC.  This included orientation for newly hired personnel, in-services for staff, continuing education for nurses and certified nursing assistants (CNAs), and infection control.

8.      Davis performed her job well.

9.      In August of 2014, Davis enrolled in a program to obtain her Masters Degree.  Because working full time while also completing classwork was stressful, Davis spoke with Cheryl Baker several times about going down to part-time.

10.     Each time Baker, a white female who held the position of Administrator at CSC, told Davis that Davis could not go part-time.

11.     Davis also contacted Micki Newton multiple times about moving to an open part-time position.

12.     Newton, the white female Director of Nursing at CSC, typically indicated that no positions were open.

13.     Throughout her time at CSC, Davis saw other similarly situated white nurses request and receive part-time hours or reduced hours to accommodate their school schedules.

14.     Additionally, Davis believed that other similarly situated white nurses were being hired and/or moving into newly created part-time positions that were not advertised or posted.

15.     In August of 2015, Davis called Kenneth Jackson, a Human Resources representative for Genesis.  Davis explained to him her requests for part-time hours and her belief that Baker and Newton were treating her differently than other nurses based on Davis's race.  Davis asked Jackson to investigate these issues.

16.     After Davis's contact with Jackson, Baker and Newton subjected Davis to increased scrutiny and harassment.

17.     For example, Baker would ask Davis for verification of her hours or schedule, even though Baker already had access to that information.  If Davis could not immediately provide the information, Baker would threaten to withhold pay or revoke Davis's ability to work at other facilities.  In staff meetings, Baker would use Davis as a 'bad example', relaying her conduct to other staff as a way to show what nurses should not be doing.  Davis would usually be the only black individual in these meetings.

18.     Newton called Davis into her office so Newton could tell Davis that Davis was allegedly clocking in and out late and needed to complete exception forms.  During that same time, Davis was aware of other white nurses who were returning to

work late from lunch, for example, who were not asked to complete exception forms.

19.     In September of 2015, Davis called Nicole Capasso, Regional HR Manger for Genesis, and Davis shared her concerns about discriminatory treatment based on her race.  Capasso said she didn't think Davis was experiencing race discrimination.

20.     Davis continued to complain about discriminatory treatment. Eventually, at Davis's request, Capasso visited CSC on November 15, 2015.  Capasso met with Baker for a period of time in Baker's office.  Then Capasso called other employees in to be interviewed.  Davis was not informed of the results of these interviews.

21.     In December 2015, Davis contacted Capasso again about open part-time positions.

22.     Davis also asked Baker and Newton to work with her on scheduling hours, due to low census at the facility.  When there are fewer individuals residing at the facility, nurses hours can be cut or re-arranged.

23.     Davis is aware of a similarly situated white nurse (Natasha Taylor) who, around that same time, was in a full-time position but was allowed to re-arrange her schedule and reduce hours to accommodate her school-related activities.

24.     Baker and Newton refused to change Davis's hours.

25.     On January 21, 2016, Davis applied for a Rehab medication cart

position.  Although this position was technically a demotion, it had a more flexible schedule that would allow Davis time to complete the clinical portion of her degree.

26.     Davis indicated that she wanted to begin that position in five weeks and would be happy to train her replacement.

27.     As of February 26, 2016, Davis had received no notice of a replacement being hired.  She contacted Jennifer Miller, who was then acting Director of Nursing while Newton was out.  Miller stated that Baker had decided to change the medication cart position to an 'LPN' designation.  Because Davis was an RN, she was over-qualified and thus could not be moved to that position.  Davis was required to continue working as the Nurse Practice Educator, which continued to be stressful and difficult in light of her school schedule.

28.     In January of 2016, Heather Terry, a white nurse, started a second, part-time job as an infusion nurse.

29.     During January and February of 2016, Terry was allowed to leave CSC during her scheduled shift to complete infusions for her part-time job.  Davis does not believe she officially clocked in and out, but Baker and Newton were aware that Terry was leaving during her shift.

30.     The clinical (practicum) portion of Davis's masters degree program was scheduled to begin in March of 2016.

31.    On February 29, 2016, the on-call schedule was posted.  Davis was scheduled on call four times.  Greni Hamilton (black) was scheduled for five shifts. Paige Fowler (white) was scheduled three times and Natasha Taylor (white) was scheduled only two shifts.

32.    Taylor told Davis that Defendant was working with her on scheduling on-call so that it would not interfere with the clinical portion of her degree program.

33.    Concerned about the conflicts on-call shifts could pose for her clinical, Davis put in for a number of days off.  Miller, the acting DON, questioned the request and Davis explained her need for time off for her degree program.  Davis again asked about switching to the medication cart position, but Miller reiterated that Baker had decided only an LPN could fill that position.

34.    Over the next two weeks, Davis had to fill in several times for nurses on the medication cart who had called out.

35.    In March 2016, Davis encouraged Joyce Thompson to apply for Davis's NPE position.  Thompson was transferred to that position and Davis was finally allowed to move to the cart position.

36.    On March 16, 2016, Baker and Miller wrote Davis up for allegedly having a verbal altercation with another employee at the nurses station earlier that day. According to Baker and Miller, Davis's conduct caused two residents to become

upset and needed to be comforted.

37.     Davis disagreed with her supervisors' characterization of the event and refused to sign the discipline.  Davis asked to view the videotape of the nurses' desk area during that time and did not see any residents near the desk who could have overheard her conversation.  Other white employees and other employees who have not complained about discriminatory treatment have had verbal outbursts and altercations in front of residents but have not been disciplined.

38.     The next day, Davis filled out the EEOC Intake Questionnaire.  Her charge of discrimination was filed in early April 2016.

39.     Davis continued to experience discrimination based on race as well as retaliation at CSC.

40.     Two white nurses put a picture of Grace Jones on Davis's medication chart.  Davis complained to Heather Terry (who had become a supervisor), but Terry did not do anything.

41.     Davis's supervisors continued to subject her to heightened scrutiny with respect to her time.  Davis was disciplined for failing to appropriately notify a supervisor of leaving late and failing to fill out an exception form for her late clock-out times. Davis was told that she must appropriately notify and document late shift ending times.

42.     Robert Ford, a white LPN, told Davis that he did not have to notify his supervisors when he left late nor was he required to fill out an exception form.

43.     Davis attempted to transfer to a different building in order to get away from the discriminatory and retaliatory treatment, but Baker blocked Davis's transfer.

44.     Davis made complaints about discriminatory treatment based on race and retaliation to Anthony Lewis, a Human Resources employee for Genesis, but her supervisors' conduct did not change.

45.     In December 2016, Terry disciplined Davis for failure to wear the correct uniform color.  Davis had never seen a policy requiring a specific color of uniform and refused to sign the discipline.  On information and belief, other white nurses have worn different color uniforms but have not been disciplined.

46.     On February 8, 2017, Davis went to the doctor.  The doctor told her not to return to work until February 13, 2017.

47.     On February 14, Newton called Davis into her office.  Newton had prepared a discipline for failure to call in with 2 hours notice on February 9.  Davis gave Newton her doctor's note.  Newton stated that Davis was also being disciplined for three episodes of tardiness and four instances of 'calling in' since January 1. Davis disputed that she had called in that many times.  Additionally, other white employees and employees who had not complained about discrimination called in

without sufficient notice and were often tardy, but were not disciplined.

48.   One of Davis's white nurse co-workers told Davis that white supervisory staff, including Cheryl Baker and Micki Newton Harper, would talk about black employees in a derogatory manner and referred to them as "the niggers in the building".

49.   On March 22, 2017, a medication was ordered for a patient.  Davis was not working that day.

50.   On March 23, Davis noticed that the medication had been ordered, but was not at the facility for use.  Davis notified her supervisor (Kelly), as she had been advised to do in the past.

51.   On March 24, the medication had still not arrived.  Davis notified Heather Terry.  Terry asked whether Jan had been notified.  Kelly said she notified Jan Hovater the day before and Hovater said she would get the medicine.

52.   On March 28, 2017, Micki Newton Harper and Heather Terry met with Davis.  Newton told Davis that she was being disciplined for failure to follow the rules about medication administration and distribution.  Davis explained that failure to have medications and supplies in a timely manner was not unusual at CSC.  She further stated that she had notified multiple people, as she had been trained to do. Newton told Davis that she was fired.

53.     Other similarly situated white employees and employees who had not complained about discrimination have dealt with the lack of medications and supplies in the same manner as Davis, but were not disciplined or terminated.

54.     Davis called her EEOC investigator and informed him about the events.

55.     On August 8, 2017, Davis received her Right to Sue Notice from the EEOC.

## IV.    CAUSES OF ACTION

### A.     RACE DISCRIMINATION

56.     The Plaintiff re-alleges and incorporates by reference paragraphs 1-55 with the same force and effect as if fully set out in specific detail hereinbelow.

57.     Davis was treated differently on account of her race in regards to discipline, scheduling, work/job assignments, and termination.

58.     The Defendant has no legitimate non-discriminatory reason for its conduct.

59.     Because of such conduct, the Plaintiff has suffered loss of income and employment benefits as well as severe emotional distress, embarrassment, and humiliation.

60.     The Defendant's actions were wilful, with malice, and with reckless disregard.

61.     The Plaintiff seeks to redress the wrongs alleged herein and this suit is her only means of securing adequate relief.  The Plaintiff is now suffering and will continue to suffer irreparable injury from the Defendant's unlawful policies and practices as set forth herein unless enjoined by this Court.

### B.     RETALIATION

62.     The Plaintiff re-alleges and incorporates by reference paragraphs 1-61 with the same force and effect as if fully set out in specific detail hereinbelow.

63.     The Plaintiff engaged in protected activity by complaining internally about said racially discriminatory treatment and by filing an EEOC Charge contesting said racially discriminatory conduct.

64.     After the Plaintiff complained internally about racially discriminatory treatment, she continued to experience discrimination based on race with respect to discipline, scheduling, job assignments, and termination.

65.     Similarly, after Plaintiff filed her EEOC charge, she continued to experience discrimination based on race, as set forth above.

66.     Plaintiff was terminated in retaliation for her prior protected activity, including her complaints to human resources and her EEOC charge.

67.     The Plaintiff was subjected to unequal treatment by the Defendant because of her race and in retaliation for opposing unlawful employment practices.

68.     The Defendant has no legitimate non-discriminatory reason for its conduct.

69.     Because of such conduct, Plaintiff has suffered loss of income and employment benefits as well as severe emotional distress, embarrassment, and humiliation.

70.     The Defendant's actions were wilful, with malice and with reckless disregard for Plaintiff's rights.

71.     The Plaintiff seeks to redress the wrongs alleged herein and this suit for injunctive and declaratory judgment is her only means of securing adequate relief. The Plaintiff is now suffering and will continue to suffer irreparable injury from the Defendant's unlawful policies and practices as set forth herein unless enjoined by this Court.

## V.     PRAYER FOR RELIEF

WHEREFORE, the Plaintiff respectfully prays that this Court assume jurisdiction of this action and after trial:

1.     Issue a declaratory judgment that the employment policies, practices, procedures, conditions and customs of the Defendant are violative of the rights of the Plaintiff as secured by Title VII of the Act of Congress known as the "Civil Rights Act of 1964," as amended, by the "Civil Rights Act of 1991," 42 U.S.C. §2000e *et*

*seq.* and 42 U.S.C. §1981 through U.S.C. §1983.

2.      Grant Plaintiff a permanent injunction enjoining the Defendant, its agents, successors, employees, attorneys and those acting in concert with the Defendant and at the Defendant's request from continuing to violate Title VII of the Act of Congress known as the "Civil Rights Act of 1964," as amended by the "Civil Rights Act of 1991," 42 U.S.C. §2000e *et seq.* and 42 U.S.C. §1981 through U.S.C. §1983.

3.      Enter an order requiring the Defendant to make the Plaintiff whole by awarding her the position she occupied prior to her discriminatory and retaliatory termination, back-pay (plus interest), front-pay, punitive damages, compensatory damages, nominal damages, declaratory relief, injunctive relief, and benefits.

4.      The Plaintiff further prays for such other relief and benefits as the cause of justice may require, including but not limited to, an award of costs, attorney's fees and expenses.

Respectfully submitted,

*/s/ Rachel L. McGinley*
Rachel L. McGinley
Alabama State Bar Number: 1892-A64M

WIGGINS, CHILDS, PANTAZIS, FISHER & GOLDFARB
301 19th Street North
Birmingham, Alabama 35203
(205) 314-0500

**Plaintiff HEREBY DEMANDS TRIAL BY STRUCK JURY.**

Plaintiff requests this Honorable Court to serve via certified mail upon the Defendant the following: Summons, Complaint.

**DEFENDANT'S ADDRESS:**

Genesis Healthcare, LLC
101 E. State St.
Kennett Square, PA 19348

*/s/ Rachel L. McGinley*
OF COUNSEL